The STATE of Texas, Appellant,

v.

TEXAS OSAGE ROYALTY POOL, INC.,
Appellee.

No. 14393.

Court of Civil Appeals of Texas.

San Antonio.

July 28, 1965.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst., T. B. Wright, Executive Asst., J. C. Davis, W. O. Shultz, Owen Wade Anderson, Asst. Attys. Gen., Austin, for appellant.

Matthews, Nowlin, Macfarlane & Barrett, Lewis T. Tarver, Jr., San Antonio, for appellee.

CADENA, Justice.

Appellant, the State of Texas, filed this action to obtain a declaration that certain shares of stock in Texas Osage Royalty Pool, Inc., appellee, and undistributed dividends declared thereon, have escheated to the State under the provisions of Art. 3272a, Vernon's Ann.Tex.Stats. The trial court held that the property in question is not subject to escheat, and the State appeals.

Appellee, Texas Osage Royalty Pool, Inc., will be referred to herein as "Osage."

The following facts are undisputed:

1. Texas Osage Cooperative Royalty Pool, hereinafter called the "trust", was organized under a declaration of trust dated May 2, 1929. The purpose of the trust was to bring together, hold, manage, control and exploit mineral interests in lands, to collect the revenues therefrom, and to make distribution of the net proceeds from time to time to the participants in the venture. Those participating in the trust received one full share or "headright," evidenced by a headright certificate, in exchange for a one-half interest in the minerals under 640 acres of land, with fractional shares

or headrights being issued for corresponding fractions of 640 acres.

2. The trustees were authorized to act as incorporators in the formation of a corporation for the purpose of receiving the trust estate and carrying out the purposes of the trust, with the trustees serving as the first board of directors of such corporation. It was expressly provided that upon the organization of the corporation, "the certificate holders hereunder shall receive shares of corporate stock in exchange for and in lieu of the trust certificates issued hereunder, said shares to represent a proportion of the entire capital stock of said corporation identical with the proportion of interest in the trust represented by the trust certificates held by them."

3. In August, 1941, the trustees organized a corporation, Texas Osage Cooperative Royalty Pool, Inc. (In 1960 the corporate name was changed to Texas Osage Royalty Pool, Inc., the present name of appellee.) On August 14, 1941, all of the mineral interests which had been conveyed to the trust in exchange for headright certificates were transferred to this corporation by the trustees. This terminated the trust.

4. The capital stock of the corporation consisted of 1,100 shares of no par value stock, representing two shares for each of the 550 headright certificates outstanding at the time of incorporation. On August 25, 1941, the original trustees, acting as the directors of the corporation, by resolution, declared a dividend of $10.00 per corporate share, "payable only upon the issuance of no par value stock of the corporation in exchange for and upon surrender of outstanding valid headright certificates issued under the declaration of trust dated May 2, 1929." This same resolution declared that no stock of the corporation was to be issued "except in exchange for valid, outstanding headrights, the consideration for the issuance of which has not failed by foreclosure or otherwise of the mineral interests for which the same were issued" by the trust.

5. On August 26, 1941, all 1,100 shares of Osage common stock were issued to the directors of the corporation, instead of to the holders of headright certificates. The directors paid for the stock by transferring all assets of the trust to the corporation. The memorandum evidencing the issuance of the stock recited that certificates representing Osage common stock were to be issued to headright owners on surrender of their headright certificates, together with proof that the consideration for the issuance of the headright had not failed.

6. Notice of the incorporation, the declaration of the dividend, and the conditions on which headright certificates could be exchanged for Osage stock was mailed to all registered owners of headrights. In 1960, the common stock was split on the basis of 100 shares, each having a par value of $1.00, for each of the original 1,100 shares of no par value stock.

7. Osage has paid dividends only to persons who have surrendered their headrights in exchange for Osage stock. However, whenever a dividend was declared and paid to such shareholders, the same dividend was declared on stock corresponding to unsurrendered headrights, and the money for the payment of these dividends has been deposited in a segregated bank account.

8. Osage has issued no stock certificates without (a) surrender of the corresponding headright certificate, or affidavit of loss thereof, containing an agreement to indemnify the corporation; and (b) proof that consideration for the issuance of the headright had not failed.

9. On January 6, 1962, pursuant to the requirements of Secs. 1 and 2 of Art. 3272a, Osage filed an "Annual Report of Property Subject to Escheat," showing that as of that date certain headright certificates corresponding to the stock which is the subject of this suit had not been exchanged for Osage stock, and that the accumulated dividends declared thereon were being held

by Osage. Attached to this report was an "Explanation" which, after detailing the history of Osage as outlined above, declared that Osage was not "holding personal property subject to escheat," and that the headrights, unissued stock or dividends, are not within the purview of Section 1 of Art. 3272a.

10. The report contained the sworn verification required by Sec. 2(f) of Art. 3272a. This verification recites that the report contains a full and complete list of all property held by Osage "for which, from the knowledge and records of the undersigned, it appears that the existence and whereabouts of the owner are unknown and have been unknown for more than seven (7) years and on which no claim or act of ownership has been asserted or exercised during the past seven (7) years and on which no will of the last known owner has been recorded or probated in the county where the property is situated within the past seven (7) years." At the end of the verification Osage added a statement to the effect that the verification was subject to and qualified by the statements contained in the "Explanation" to which reference has been made in the preceding paragraph of this opinion.

Osage makes no claim to the stock or dividends in question. The State has abandoned its claim to 162 shares of stock, and dividends declared thereon, corresponding to the headright certificates issued to Mrs. L. L. Nail, Mrs. Caroline Bradshaw, and William Pfrehm, all of whom are deceased. It appeared at the trial that the heirs of such persons had exchanged, or were in the process of exchanging, such headright certificates for the corresponding stock and accumulated dividends.

■ Essentially, the theory advanced by Osage is that the State is not entitled to the stock and dividends unless it can make the proof of non-failure of consideration which would have been required of the holders of the unsurrendered certificates. This contention rests on the elementary rule that the State cannot acquire by escheat property or rights which were not possessed at the time of the escheat by the unknown or absent owners of such property or rights. Hall v. Claiborne, 27 Tex. 217 (1863); State by Parsons v. United States Steel Corporation, 22 N.J. 341, 126 A.2d 168; Brown v. United States, 65 F.2d 65 (9th Cir.).

The disposition of this case, then, depends on the validity of the August 25, 1941, resolution adopted by the board of directors of Osage, which imposed the requirement of proof of non-failure of consideration.

■ Under the plain and unambiguous language of the declaration of trust, when the corporation was formed in 1941 the holders of headrights were to receive stock in the corporation in an amount proportionate to their interest in the trust. As the Galveston Court of Civil Appeals said in Yeaman v. Galveston City Co., 173 S.W. 489, certified questions answered, 106 Tex. 389, 167 S.W. 710 (1914), "That instrument is the charter of the company, and all that was lawfully done thereafter in completing and perfecting the organization of the company was done under its authority, and the rights and liabilities of the shareholders and the powers of the company or the corporation in acts affecting such rights and liabilities are to be measured by its provisions." 173 S.W. at 497.

The only power which the declaration of trust vested in the trustees, insofar as the formation of a corporation is concerned, was the power to form a corporation in which the owners of headrights became, ipso facto, shareholders. The rights of owners of headrights in the trust became vested when they performed their obligations by transferring mineral interests to the trust. Prior to the formation of the corporation, the headright owners could exercise their rights in the trust without proving that the consideration given in exchange for their headrights had not failed.

He who seeks to avoid his obligations under a written instrument on the ground of failure of consideration has the burden of proving such failure. Pickett v. Bishop, 148 Tex. 207, 223 S.W.2d 222 (1949); Beauchamp v. Couch, 54 Tex.Civ.App. 471, 117 S.W. 924, wr. ref.; 1 McCormick and Ray, Texas Law of Evidence (2d ed., 1956), § 112, p. 160.

We believe that the decision of our Supreme Court in Yeaman v. Galveston City Co., 106 Tex. 389, 167 S.W. 710 (1914), compels the conclusion that the unilateral attempt by Osage to impose restrictions on the vested rights of the headright owners in connection with the transformation of the trust into a corporation was a nullity. In Yeaman, a trust was formed for the purpose of disposing of land in the City of Galveston. The participants in the trust conveyed land to the trust in exchange for trust certificates. At a later date, the trust was transformed into a joint stock company which, in 1841, was incorporated by special act of the Congress of the Republic of Texas. In 1856, by resolution adopted at a shareholders' meeting, it was declared that holders of outstanding trust certificates would not be entitled to vote or to receive dividends until they surrendered the certificates held by them and took out renewal certificates evidencing ownership of shares in the corporation.

The holder of five shares of the unsurrendered "Trustee Stock" sued to establish his rights as a stockholder in the corporation and to recover dividends due him as such stockholder, as well as for other relief not relevant here. The Galveston Court of Civil Appeals certified to the Supreme Court the question whether the owners of trustees' certificates, issued under the trust agreement, became by virtue of such ownership stockholders in the corporation. In answering this question in the affirmative, the Supreme Court said (167 S.W. at pp. 720–721):

"* * * In a corporation the certificate of stock is not the stock itself; it is but a muniment of title, an evidence of the ownership of the stock. It is not necessary to a subscriber's complete ownership of the stock. He becomes a full stockholder, certainly where he has performed his obligation, and possesses all of a stockholder's rights, even if no certificate is issued to him at all. * * *

"The purchasers of shares sold by the trustees and evidenced by the trustee certificates had all the standing of founders of the Galveston City Company as it stood prior to its incorporation. By their purchase of its shares they made it possible, brought it into existence, and gave it its character as a joint-stock company. They were the company itself, invested with full ownership of its outstanding stock, and their status as shareholders established. The issuance of the company's renewal certificates * * * added and could add nothing to their rights as stockholders. They stood at that time already complete and perfected under the law, capable of assertion and entitled to full recognition. * * *

"* * * No principle of law is better settled than that which affirms that the payment of his subscription by an original subscriber to the capital stock of a corporation constitutes him a stockholder, * * * regardless of the issuance of any certificate. * * *

"* * * Each purchaser of these shares was in the attitude of consenting to the relationship created by every other purchase. In their purchase the company had its origin; out of them it grew up and took its form; and it can hardly be contended that any formal recognition by the body which their ownership created was necessary * * to constitute their owners its stockholders."

Osage next contends that the State has no right to the undistributed dividends declared on the stock in question because the right to dividends, as distinguished from the right to stock, may validly be made dependent on compliance with the conditions imposed by the resolution of August 25, 1941. This contention ignores the fact that in the Yeaman case the plaintiff was successful in his suit for dividends. Here, as in Yeaman, "The rights of third-parties have not intervened. All of the present stockholders acquired their stock with full notice of the rights of the holders of trustees' certificates as shareholders in the corporation." 173 S.W. at p. 497.

What has escheated to the State consists of the rights of the owners of stock which has remained unclaimed since 1941. These rights include, under the Yeaman decision, the right to dividends which have been declared on such stock but which remain unpaid and are presently held by Osage. The record in this case establishes that the whereabouts of the owners of the unclaimed stock has been unknown for more than twenty years, and that the whereabouts of the headright certificates is also unknown. Osage has introduced no evidence showing the assertion of hostile claims to the stock or to the dividends. Under the express provisions of Sec. 4(h) of Art. 3272a, Osage is relieved of any liability to any claimant to the stock or dividends in question. All subsequent claims to the property involved in this litigation must be presented to and, if valid, will be paid by the State of Texas. Art. 3272a, §§ 6, 7.

The judgment of the trial court is reversed and judgment is here rendered that the stock and dividends in question, with the exception of the stock now being claimed by the Nail, Bradshaw and Pfrehm heirs, have escheated to, and the title thereto is vested in, the State of Texas, and directing appellee, Osage Royalty Pool, Inc., to deliver said property promptly to the Treasurer of the State of Texas.